**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Duval Sanders,                                             Civil No. 05-686 (DWF/AJB)

          Plaintiff,

v.                                                         **MEMORANDUM**
                                                           **OPINION AND ORDER**

Johnson Brothers Liquors, Inc.,

          Defendant.

_____

Lawson A. Waturuocha, Esq., Lawson Wats & Associates, PA, counsel for Plaintiff.

Steven C. Miller, Esq., Law Offices of Steve C. Miller, PA, counsel for Defendant.

_____

**INTRODUCTION**

      Duval Sanders, an African-American man, brought this action against Johnson Brothers Liquors, Inc. ("Johnson"), after Johnson did not hire him for a permanent position. This matter came before the Court on September 29, 2006, pursuant to Johnson's Motion for Summary Judgment. For the reasons set forth below, the Court grants the motion.

**BACKGROUND**

**I.    Sanders works for Johnson**

      Johnson is a wholesale distributor of wine and spirits in St. Paul, Minnesota. Teamsters Local 792 represents Johnson, and under a collective bargaining agreement, Johnson uses several classifications of workers in its warehouse, including seniority and

ratio employees.  Under the collective bargaining agreement, Johnson can hire one ratio employee for every two seniority employees.  Johnson also employs certain non-union employees such as vacation-replacement employees, who fill in for vacationing permanent employees; seasonal employees, who are terminated when Johnson's four-month busy season ends; and temporary and part-time employees.

Sanders worked for Johnson as a ratio employee at its University Avenue location from January 10, 2001, until March 1, 2001.  During that time, Sanders worked in the night warehouse operation helping to load trucks for delivery to retail customers.  Johnson fired Sanders after he missed work because he was attending a funeral.[1]

In the fall of 2001, Johnson moved its headquarters in St. Paul from University Avenue to Shepard Road.  According to Sanders, Johnson employs fewer minorities at its Shepard Road location than it did at its University Avenue location.  In April 2002, Sanders approached Johnson for a job, but Anthony LaSalvia, Johnson's night warehouse manager, told Sanders that Johnson was not hiring but that he would not object if OnSite Temporary Service ("Onsite") assigned Sanders to work for Johnson.  Sanders applied to work for Onsite, and Onsite hired and assigned Sanders to Johnson beginning on April 23, 2002.  Under Onsite's contract with Johnson, Johnson cannot offer temporary workers a permanent position until they have worked for Onsite for 90 days.  Sanders worked for Johnson, through Onsite, until June 17, 2003, when Johnson informed Onsite that it no

---

[1]      Sanders' claims against Johnson are not based on his 2001 employment.
(Footnote Continued on Next Page)

2

longer needed Sanders' services.

## II.    Procedural History

On September 12, 2003, Sanders filed a charge of discrimination against Johnson with the St. Paul Human Rights Department ("Department") and the Equal Employment Opportunity Commission ("EEOC").  On September 28, 2004, the Department issued a Memorandum of Findings ("Memorandum") in which it found that probable cause existed as to whether Johnson had discriminated against its African-American employees. In the Memorandum, the Department does not name the witnesses on which it relies on or distinguish between types of jobs available at Johnson.  At some point, Johnson met with the Department to discuss the Memorandum.

On November 23, 2004, the Department sent a letter to Sanders informing him that it had ended its investigation of Johnson and had found that no further use of the Department's resources was warranted.  In that letter, the Department informed Sanders that he had 45 days from receipt of the letter to bring a civil action against Johnson. Additionally, on January 18, 2005, the EEOC sent Sanders his Notice of Right to Sue, which informed him that he had 90 days from receipt of the notice to bring a civil action against Johnson.

On April 6, 2005, Sanders filed a Complaint in this Court, alleging claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* (2000),

---

(Footnote Continued From Previous Page)

the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 (2004), and the Saint Paul Human Rights Ordinance, Chapter 183. On June 20, 2006, Johnson filed a motion for summary judgment on all claims and noticed the motion hearing for September 29, 2006. To support its motion for summary judgment, Johnson submitted the Affidavit of Steven C. Miller, which includes the deposition of Sanders and Sanders' answers to request for admissions; the Affidavit of Anthony LaSalvia, and the Affidavit of Susan Ewers.

Pursuant to Local Rule 7.1(b), Sanders' opposition to the summary judgment motion was due 20 days before the hearing. He failed to file a timely opposition. On September 25, 2006, a representative of the Court contacted Sanders about his failure to submit an opposition and informed him that he should contact the Court in writing to see if the Court would allow him to appear at the hearing or file an opposition. On September 28, 2006, the Court received a 10-page letter from Sanders, which did not contain a request to appear at the hearing or file an opposition. In that letter, Sanders provides no factual or legal support for any of his statements or arguments. The Court held its motion hearing on September 29, 2006. Over the objection of Johnson, the Court received Sanders' letter and allowed Sanders to present his arguments, while also reserving the right to impose sanctions against Sanders under Local Rule 7.1(d).

**DISCUSSION**

**I.    Summary Judgment**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court

must view the evidence and the inferences, which may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). As the United States Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Title VII

In essence, Sanders asserts three claims under Title VII—failure to hire, unlawful discharge, and hostile work environment.[2]  The Court will discuss each claim in turn.

### A.     Failure-to-Hire Claim

While he was working for Onsite and assigned to Johnson, Sanders asserts that he repeatedly asked Johnson for a full-time "permanent" job and was denied such a position when there were available positions.  He makes no distinction between seniority, ratio, vacation, or seasonal positions; instead, he generically asserts that he wanted a permanent position.  Sanders also asserts that Johnson offered a Caucasian Onsite Onsite worker, Dave Ruby, a permanent position while Sanders was working at Johnson.

Sanders has produced no direct evidence of discrimination; therefore, the Court analyzes his failure-to-hire claim under the burden-shifting framework of *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973).  *See Arraleh v. Country of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006).  To establish a prima facie case of race discrimination for a failure-to-hire claim, a plaintiff must establish four elements:  (1)  he was a member of a protected class; (2) he was qualified for the position for which the employer was accepting applications; (3) he was denied the position; and (4) the employer hired someone from outside the protected class.  *Id*.  Once a plaintiff establishes his prima facie case, the

---

2     Although the Complaint does not specifically allege three separate counts, a liberal reading of the Complaint, Sanders' answers to request for admissions, and his statements during the motion hearing statements suggest that he is asserting these three claims.

(Footnote Continued on Next Page)

employer must articulate one or more legitimate, nondiscriminatory reasons for its decision not to hire the plaintiff. *Id*. If the employer does so, the plaintiff must then establish that the employer's proffered reason was pretextual. *Id*.

Johnson asserts that Sanders cannot establish his prima facie case and, even if Sanders has established a prima facie case, Johnson asserts that it legitimately decided not to hire Sanders because he was habitually late. By way of LaSalvia's affidavit, it submits affirmative evidence that negates Sanders' allegation that Johnson was accepting applications for permanent employees during Sanders' employment and that Johnson hired individuals outside of Sanders' protected class. Specifically, LaSalvia avers that no individuals were hired either from temporary assignments or from new applications for any "permanent" position in the night warehouse during Sanders' tenure. (LaSalvia Aff. ¶ 5.) Johnson defines permanent to mean a ratio position, as opposed to seniority, seasonal, or vacation positions. (*Id*. ¶¶ 5-6.) Johnson does not state whether there were full-time seniority, seasonal, or vacation positions available, although it appears that Sanders was not eligible for a seniority position. (*Id*.)

Johnson also negates Sanders' allegation about Dave Ruby. Johnson explains that it has no payroll records for a Dave or David Ruby, but that an individual, who is Caucasian and named David Randolph, worked for Johnson, through Onsite from October 3, 2002 through December 28, 2002. (*Id*. ¶ 8.) Johnson never offered Randolph a position, and in fact, he

---

(Footnote Continued From Previous Page)

was not eligible for one because he had not worked for 90 days. (*Id*. ¶¶ 8-9.) Finally, Johnson explains that, at some point, it did offer one Onsite employee, who was African-American, a ratio position. (*Id*. ¶ 7.) Johnson rescinded the offer, however, when it discovered during a background check that the employee had been convicted of theft. (*Id*. ¶ 7.) That employee continued to work for Johnson as a temporary employee until he voluntarily resigned a few months after the offer was withdrawn. (*Id*. ¶ 7.)

In response, Sanders offers no evidence to rebut Johnson's evidence. Rather, he relies exclusively on his allegations contained in the Complaint.[3] A party opposing a summary judgment motion, however, "may not rest on mere allegations . . . [and] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

---

3     Sanders also relies on the Department's Memorandum, which was attached to the Complaint. The Memorandum is highly conclusory and unduly prejudicial especially because the Department terminated its investigation, never held a probable cause hearing, and refused to give Johnson access to its documents related to Sanders' claim. If this case were to proceed to trial, the Memorandum would not be admissible. *See Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1309 (8th Cir. 1984) (discussing standard for admitting agency reports under Fed. R. Evid. 803(8)(C)); *Rueda v. West Side Community Health Serv.*, 2003 WL 22508089 at *6, n.6 (D. Minn. Nov. 3, 2003) (concluding plaintiff, by relying exclusively on an agency's findings, had not met her summary judgment burden because court is not bound to an agency's findings). Given this, the Court may not consider the Memorandum for the purposes of this motion. *See Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) ("In ruling on a motion for summary judgment, the district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial." (internal quotation omitted)). If any of the findings in the Memorandum are accurate, they are indeed troubling. However, if Sanders wanted to rely on the witnesses or factual statements contained in the Memorandum, he should have deposed those witnesses, requested Johnson's hiring records, or presented statistical evidence about Johnson's hiring practices.

(Footnote Continued on Next Page)

Viewing the admissible evidence in the light most favorable to Sanders, there is nothing in the record to suggest that Johnson was accepting positions for any permanent positions or that it hired employees outside of Johnson's protected class. Therefore, Sanders cannot establish the second and fourth elements of his prima facie case. Moreover, for the reasons discussed below, Johnson has expressed a legitimate reason--Sanders' tardiness—for its decision not to hire Sanders. Accordingly, Sanders has failed to meet his burden at the summary judgment stage, and the Court grants Johnson's motion with respect to Sanders' failure-to-hire claim. *See Celotex*, 477 U.S. at 331-33 (explaining that a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

### B.     Unlawful Discharge Claim

Sanders asserts that he was unlawfully discharged because he is African-American. He claims that he performed his job well and that Johnson's tardiness excuse is pretextual because it never warned Sanders about his lateness. In addition, he asserts that other, non-African-American workers who were tardy were not terminated.

As with the failure-to-hire claim, the Court analyzes Sanders' unlawful discharge claim under the burden-shifting framework of *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973). *See Canady v. Wal-Mart Stores, Inc.,* 440 F.3d 1031, 1034 (8th Cir. 2006). To establish a prima facie case of race discrimination for unlawful discharge, a plaintiff must

---

(Footnote Continued From Previous Page)

establish four elements: (1) he was a member of a protected group; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) there are facts that permit an inference of discrimination. *Id*.

Johnson does not dispute that Sanders was its employee for the purposes of defending the unlawful termination claim. *See Lerohl v. Friends of Minnesota Sinfonia*, 322 F.3d 486, 489 (8th Cir. 2003) (explaining that the Eighth Circuit uses a common-law agency test to determine whether a person is an employee for the purposes of Title VII); *Hunt v. State of Missouri, Dept. of Corrections*, 297 F.3d 735, 742 (8th Cir. 2002) (affirming district court's decision that nurses assigned to the Department of Corrections through a staffing agency were employees of both the staffing agency and the Department of Corrections). Rather, it argues that Sanders cannot demonstrate that he was meeting Johnson's legitimate expectations because he was consistently tardy to work.

Specifically, Johnson's time-clock records reveal that Sanders had the worst tardiness record of both Johnson employees and Onsite employees working in Johnson's night warehouse. (LaSalvia Aff. ¶¶ 10-12, Ex. A.) Sanders was late 5 minutes or more to his job on 43 occasions; on one of those occasions he was 47 minutes late, and on another occasion, he was 23 minutes late. (*Id*.) Sanders' tardiness record was more severe than other employees. For example, another Onsite worker had the second-worst tardiness record in the night warehouse, when he was late 5 minutes or more on 16 occasions. (*Id*.) Moreover, Johnson asserts that Sanders had a problem with breakage of bottles and that he needed more help than other workers. (*Id*. ¶ 11.)

10

In response, Sanders offers no new evidence or reference to the record to rebut LaSalvia's statements. In his deposition, he claims that he broke few, if any, bottles. (Miller Aff., Ex. A at 34.) And he denies being late, despite the fact that his time records show otherwise. (*Id*. at 132-33.)

Viewing the admissible evidence in the light most favorable to Sanders, there is no genuine issue of material fact with respect to whether Sanders was meeting Johnson's legitimate expectations. He was not, at least with respect to timeliness. Therefore, Sanders cannot establish his prima facie case, and the Court grants Johnson's motion with respect to Sanders' unlawful termination claim. *See Celotex*, 477 U.S. at 331-33.

### C. Hostile Work Environment Claim

While he was working for Onsite and assigned to Johnson, Sanders claims that he was subject to racial harassment during his employment. Title VII prohibits an employer from engaging in racial harassment that creates a hostile or offensive working environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). A racially hostile work environment exists when an employer creates or condones a work environment that "significantly and adversely affects the psychological well-being of an employee because of his or her race." *Gilbert v. City of Little Rock, Ark.*, 722 F.2d 1390, 1394 (8th Cir. 1983).

Here, Sanders describes several instances that he asserts created a hostile work environment and states that he complained to LaSalvia about some of the following incidents. First, in August 2002, Sanders asserts that certain Johnson employees made references to "Jungle Bunnies" by calling two Sudanese warehouse workers "Greg the

Bunny" and "Benny the Bunny."  Shortly thereafter, Matt Anderson, a Johnson supervisor, drove by the two Sudanese workers and referred to them as hollow or invisible because he could not see the workers in the dark warehouse.  Second, Sanders asserts that LaSalvia criticized the lucrative sports contracts sports teams offered African-American athletes and that LaSalvia made remarks about O.J. Simpson's and James Brown's legal troubles.  Third, after Sanders was pulled over by a police officer on the way to work, Sanders claims that LaSalvia said that he understood why the police officer pulled Sanders over.  Fourth, Sanders asserts that some Johnson employees referred to African-American workers as "brothers."

Sanders' hostile work environment claim is also evaluated under the burden-shifting analysis of *McDonnell Douglas*.  *See Tatum v. City of Berkeley*, 408 F.3d 543, 550 (8th Cir. 2005).  To establish a prima facie case of racial discrimination based on a hostile work environment, Sanders must establish:  (1) that he belongs to a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on race; (4) that the harassment affected a term, condition, or privilege of his employment; and (5) that Johnson knew or should have known of the harassment and failed to take proper remedial action.  *Id.*

A hostile work environment must be determined from the totality of the circumstances, and a few isolated incidents of harassment do not create a hostile work environment.  *Gilbert*, 722 F.2d at 1394.  Moreover, to demonstrate that the harassment altered the terms and conditions of one's employment, the conduct alleged must be severe

and pervasive, both objectively and subjectively. *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006). When determining whether a work environment is hostile, a court examines all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005).

Sanders' allegations, even if true, did not create a hostile work environment. Sanders' most serious allegations involve the Sudanese workers, not himself, and those workers never complained about the comments. The other alleged incidents, even if they were motivated by racial animus, are isolated incidents that are insufficient to create a hostile work environment. Moreover, Sanders has not shown how the incidents, taken together or separately, altered his employment. Without more, Sanders has not demonstrated that his psychological well-being was "significantly and adversely" affected by these incidents. *See, e.g., Gilbert*, 722 F.2d at 1394-95; A*rraleh*, 461 F.3d at 979. Accordingly, Sanders has not met his burden with respect to his hostile work environment claim, and the Court grants Johnson's motion with respect to this claim. *See Celotex*, 477 U.S. at 331-33.

### III.   Saint Paul Human Rights Ordinance and MHRA Claims

Sanders also asserts claims for failure to hire, unlawful discharge, and hostile work environment under the Saint Paul Human Rights Ordinance and the MHRA. Chapter 183.202(1)(a)(2) of the Saint Paul Human Rights Ordinance required Sanders to

bring a claim in court within 45 days after receipt of notice that the director has determined that further use of the Department's resources were not warranted.  The Department sent Sander's the notice that further use of Department resources was not warranted on November 23, 2004.  Sanders commenced this suit on May 6, 2005, which is more than 45 days after he received the notice.  Therefore, Sanders' claims under the Saint Paul Human Rights Ordinance are untimely.

Claims under the MHRA must be filed with the Minnesota Human Rights Department or the district court within one year of the allegedly discriminatory conduct.  Minn. Stat. § 363A.28, subd. 3 (2004).  Here, the one-year limitations period began to run on June 17, 2003, when Johnson informed Onsite that it no longer needed Sanders' services.  *Turner v. IDS Fin. Servs., Inc.*, 471 N.W.2d 105, 108 (Minn. 1991).  Because Sanders brought his claims under the MHRA more than a year after June 17, 2003, his MHRA claims are time-barred.[4]  Therefore, the Court grants Johnson's motion with respect to Sanders' Saint Paul Human Rights Ordinance and MHRA claims.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. Defendant Johnson Brothers Liquors, Inc.'s Motion for Summary Judgment (Doc. No. 8) is **GRANTED**.

---

[4] If Sanders' Saint Paul Human Rights Ordinance and MHRA claims were not untimely, they would nonetheless fail because they are analyzed under the same standard as his Title VII claims.  *See, e.g.*, *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1006 (8th Cir.

(Footnote Continued on Next Page)

    2.    Plaintiff Duval Sanders' Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

    **LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  October 27, 2006              s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            Judge of United States District Court

---

(Footnote Continued From Previous Page)
2005).